UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>               Plaintiff,<br><br>    v.<br><br>PRO-SET ERECTORS, INC., and Idaho corporation, and LEONE & KEEBLE, INC., a Washington Corporation,<br><br>            Defendants. | Case No. 2:11-cv-00420-MHW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are a Motion for Summary Judgment (Dkt. 20) and Motion to Strike Affidavit (Dkt. 43) filed by Plaintiff Nautilus Insurance Company ("Nautilus").[1]  Having considered the record, including the briefs and affidavits of the parties, and having considered the oral arguments heard on January 16, 2013, the Court will grant Nautilus' Motion for Summary Judgment.  The Court will resolve the issues raised in the Motion to Strike within the analysis of the summary judgment motion rather than addressing it separately.

After considering the parties' statements of fact and their respective objections, as well as rejecting any legal conclusions or unsupported factual statements identified in the

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.SC. § 636(c).

Motion to Strike, the Court finds the following facts.

## BACKGROUND

This case involves a dispute about whether or not Leone & Keeble, Inc. ("L&K") was an additional insured under a commercial general liability insurance policy issued to Pro-Set Erectors, Inc. ("Pro-Set").  In order to place the dispute in context, it is necessary to discuss the business relationship between L&K and Pro-Set, the circumstances surrounding the purported issuance of an additional insured endorsement to L&K, and the subsequent injury to one of Pro-Set's employees, Delbert Williams.

**A.    Business Relationship**

On November 10, 2006, L&K, as the general contractor, entered into a contract with the Lakeland School District to construct a building for the Twin Lakes School District (the "Lakeland project" or the "Project") in Rathdrum, Idaho.  *Pl.'s Statement of Facts* ¶ 1.  In March of 2007, L&K entered into a subcontract with Pro-Set whereby Pro-Set agreed to provide structural steel, steel joists, and other metal fabrication for the Project.  *Id.* ¶ 2.

Even before these events had occurred, on October 16, 2006, Pro-Set had purchased a commercial general liability insurance policy (the "Policy") from Nautilus to cover its business operations naming Pro-Set as the primary insured and several entities as additional insureds.  *Id.* ¶¶ 3, 4, and 11.  Pro-Set had obtained this policy through the Jerry S. Carlson Insurance Agency (the "Carlson Agency") which was located in Hayden Lake, Idaho, and described by the parties as an "insured producer" or "retail producer" or

"retail agent."  *Am. Compl.*, Ex. A, Dkt. 1-1.  *Affidavit of Michelle R. Nelson* ¶ 4 (Dkt. 33); *Affidavit of Sharon Bruce*  ¶ 3 (Dkt. 34).  The Carlson Agency obtained the insurance policy from Nautilus' designated Idaho agent, Hull & Company.

When Pro-Set later entered into its business arrangement with L&K, it became contractually required to be insured, which it was through Nautilus, and to obtain and provide to L&K an additional insured endorsement and certificate of liability under the Policy.  *Pl.'s Statement of Facts* ¶ 15; *Nelson Aff.* ¶ 3.  On March 27, 2007, Michelle Nelson, Pro-Set's bookkeeper and corporate Secretary, requested the Carlson Agency to add L&K and the Lakeland School District to Pro-Set's commercial general liability policy.  *Nelson Aff.* ¶ 5.  On March 29, 2007, Ms. Nelson received from the Carlson Agency an additional insured endorsement and a certificate of liability indicating that those entities had been added as additional insureds on the Policy.  *Nelson Aff.* ¶ 6.

In August of 2007, Delbert Williams was working for Pro-Set on the Lakeland project.  He was working on scaffolding approximately 40 feet from the ground when he fell and sustained various injuries.  *Pl.'s Statement of Facts* ¶ 8.  After his injuries, which were undisputedly incurred in the course of his employment on the Lakeland project, Williams filed for and received workers' compensation benefits from the State of Idaho through the coverage carried by Pay Check Connection.  *Jost Depo Excerpt* at 8.  Pro-Set had entered into an agreement with Pay Check Connection whereby Pay Check Connection agreed to provide human resource services for Pro-Set employees, such as Delbert Williams, by issuing paychecks and providing workers' compensation coverage

through the Idaho State Insurance Fund.[2]  *Jost Depo*. at 6-8.

In June of 2008, Williams filed a lawsuit in the Washington Superior Court in Spokane County against general contractor L&K alleging claims of negligence.  *Pl.'s Statement of Facts* ¶ 7.  More specifically, Williams alleged he was injured because L&K had failed to take the proper steps to provide for his safety while he was working on the scaffolding during the Project.  *Id.* ¶ 9.  *See Washington Compl.*, Dkt. 1-1 at 97-99.

L&K tendered the defense of the Washington case to Pro-Set.  Both L&K and Pro-Set then tendered the defense to Nautilus on the grounds that L&K was an additional named insured under Pro-Set's Nautilus policy.[3]  Nautilus denied coverage on several grounds, primarily that L&K was never properly designated as additional insured under the Policy because the Carlson Agency was never authorized to issue such endorsement without approval from Nautilus' designated agent, Hull & Company.  Additionally, Nautilus denied coverage based on two exclusions in the Policy.  *Pl.'s Statement of Facts* ¶¶ 5-6.  First, the Nautilus policy contains an exclusion for "Employer's Liability," which

---

[2]  L&K contends that Williams was an employee of Pay Check Connection rather than of Pro-Set. The cited support for its contention is an excerpt of the deposition testimony of Su Jost, Director of Client Services for Pay Check Corporation.  *Affidavit of Andrew C. Bohrnsen*, Attachment 1, Dkt. 40-1. Review of that testimony together with the Nelson Affidavit and an excerpt of Ms. Nelson's deposition testimony clearly supports a finding that the two entities were co-employers of Williams.  *Id.*;  *Nelson Aff.* ¶ 7; *Reply, Ex. A, Nelson Depo. Excerpt* at 24-28, Dkt. 44-2 at 6-7; *Reply, Ex. B., Jost Depo. Excerpt* at 6-7, Dkt. 44-3 at 5-7.  Williams was an employee of Pro-Set, but Pay Check Connection provided payroll services to Pro-Set in that they provided Williams' paycheck, human resource services, and workers' compensation coverage.  *Id.*

[3]  Nautilus asserts that it did not receive notification of the existence of either the unauthorized additional insured endorsement or the certificate of liability insurance that Carlson purported to issue to L&K until after Williams filed the Washington action.  *Pl.'s Statement of Facts* ¶ 24.

**MEMORANDUM DECISION AND ORDER - 4**

excludes coverage for bodily injury sustained by an employee of any insured arising out of and in the course of employment by any insured or performing duties related to the conduct of any insured's business. *Id*. ¶ 5.  Second, the Nautilus policy contains an exclusion for "Worker's Compensation and Similar Laws," which excludes coverage for any obligation of the insured under a workers' compensation, disability benefits, or unemployment compensation law or any similar law. *Id*. ¶ 6.

**B.      Circumstances Regarding Issuance of Policy and Additional Insured Endorsements**

When Nautilus filed its application to do business in the State of Idaho, it designated  Hull & Company ("Hull") of Kalispell, Montana  (presumably registered to do business in the State of Idaho), as its agent.  *Pl.'s Statement of Facts* ¶ 4.  Hull, in turn, did business with insured producers such as the Carlson Agency.

Pro-Set was one of the Carlson Agency's larger commercial accounts and had been its customer for several years prior to 2006.  *Nelson Aff.* ¶ 4; *Bruce Aff.* ¶ 3.  Sharon Bruce, former office manager of the Carlson Agency, frequently handled requests from Pro-Set to name parties to the Nautilus policy as additional insureds.  *Bruce Aff.* § 3.  Because of Pro-Set's numerous additional insured requests, Hull provided the Carlson Agency with blank endorsement forms to complete when Pro-Set requested an additional insured endorsement. *Affidavit of Jerry S. Carlson*  ¶ 7.

It was the Carlson Agency's "regular practice and procedure" to issue additional insured certificates and then send a copy to Hull.  *Bruce Aff. ¶¶*  6-7. *Carlson Aff.* ¶ 8.

Hull never objected to the "dozens" of additional insured certificates issued by the Carlson Agency.  *Bruce Aff.* ¶ 8; *Carlson Aff.* ¶ 9.  However, there is no direct evidence that the additional insured endorsement and certificate of liability naming L&K were ever faxed or otherwise sent to Hull or to Nautilus.

The Carlson Agency did not have any business relationship with Nautilus.  *Pl.'s Statement of Facts* ¶ 14.  The Carlson Agency admittedly had no need or reason to communicate directly with Nautilus.  *Bruce Aff.* ¶ 10.  Additionally, Nautilus never made Carlson its designated agent in the State of Idaho, did not file a notice of appointment of the Carlson Agency with the Idaho Department of Insurance, did not authorize Carlson to act as its agent, did not have any known contact with Carlson, did not know that Carlson was holding itself out as Nautilus' agent or agree that Carlson could do so, and did not know that Carlson purported to issue additional insured endorsements or certificates of liability insurance.  *Pl.'s Statement of Facts* ¶¶ 17-23.

## C.    Washington Litigation

As will be discussed more fully below, the Washington Superior Court dismissed Delbert Williams' action on grounds of lack of jurisdiction based on the Idaho Industrial Commission's decision to award him workers' compensation benefits.  *See Williams v. Leone & Keeble, Inc.*, 254 P.3d 818, 823 n. 6 (Wash. 2011) (*"Williams I"*).  Alternatively, the court found that Idaho law would apply to issues raised in the tort action if the court did not lack subject matter jurisdiction barring the action.  *Id.*  The Washington Court of Appeals affirmed.  However, on June 9, 2011, the Washington

Supreme Court reversed and remanded to the Court of Appeals for review of the trial court's determination that Idaho law applied.  *Id.*  On September 12, 2012, the Court of Appeals ultimately determined that Washington law should be applied.  *See Williams v. Leone & Keeble, Inc.*, 285 P.3d 906 (Wash. App. 2012) (*"Williams II"*).

**D.      Idaho Litigation**

Nautilus initially filed a complaint against Pro-Set and L&K in the district court of the First Judicial District of the State of Idaho in and for the County of Kootenai in 2009.  *See Notice of Removal, Ex. C, Kootenai County Docket*,  Dkt. 1-3.  The case was stayed from May of 2009 through August of 2011 while the appeals worked their way through the Washington courts.  *Id.*; *Pl.'s Brief* at 4.  On August 8, 2011, after the Washington Supreme Court ruled that the Williams action was not barred under Washington law, Nautilus amended its Complaint to add Travelers Property Casualty Company of America ("Travelers") as a defendant.  *Am. Compl.*, Dkt. 1-1; *Pl.'s Brief* at 4.  On September 8, 2011, Travelers removed the case to this Court.

In the Amended Complaint, Nautilus claims that L&K was not an additional insured under the Policy it issued to Pro-Set, that the Policy excludes liability for obligations arising in the context of injuries to employees, that L&K was insured under its own commercial general liability policy with Travelers, and that Nautilus was not required to defend or indemnify Pro-Set or L&K in the Washington action.  Nautilus also sought contribution from Travelers under *its* commercial general liability policy issued to L&K for the defense of L&K.  Nautilus subsequently agreed to dismiss Travelers without

prejudice.  *See Order*, Dkt. 15.  In its pending summary judgment motion, Nautilus seeks declaratory judgment that it is not required to defend or indemnify either Pro-Set or L&K.

**E.     Motion to Strike**

Nautilus claims that some of the statements contained in the Bruce and Carlson affidavits are inadmissible because they are self-serving, lack evidentiary support, are hearsay, and contain legal conclusions.  In order to preserve a hearsay objection, "a party must either move to strike the affidavit or otherwise lodge an objection with the district court."  *Pfingston v. Ronan Engineering Co.,* 284 F.3d 999, 1003 (9th Cir. 2002).  In the absence of objection, the Court may consider hearsay evidence.  *Skillsky v. Lucky Stores, Inc.,* 893 F.2d 1088, 1094 (9th Cir. 1990).  Pro-Set has not filed a response to the motion to strike.

As explained below, the Court finds that Nautilus' objections to certain portions of the Bruce and Carlson affidavits are well-founded and that the challenged statements are unsupported by the requisite detailed admissible facts.  Accordingly, Nautilus' Motion to Strike is granted as to those challenged statements.  The remaining statements in the affidavits are not stricken and are contained in the recitation of facts above.

**1.     Carlson Affidavit**

Nautilus objects to Jerry Carlson's statement that "[t]he Carlson Insurance Agency was specifically authorized by Hull & Company to issue Additional Insured Endorsements directly from our office without first getting specific approval from Hull & Company for each such endorsement."  *Carlson Aff.* ¶ 6.

Despite making this assertion, Mr. Carlson does not aver or provide evidence as to when or by whom Hull provided the authorization to the Carlson Agency.  Nor does he explain whether or how Hull received authorization from Nautilus to vary from the usual procedure for issuance of additional insured endorsements and certificates of liability insurance.  The statement is clearly conclusory.  As such, it is not sufficient to raise a genuine issue of material fact.  Furthermore, Mr. Carlson's statement that some unidentified person at Hull authorized him to issue endorsements is inadmissible hearsay offered to prove the truth of the matter asserted.  *See Fed. R. Evid.* 802.

Nautilus also objects to Mr. Carlson's statements that it was standard practice for his office to send a copy of the endorsement to Hull and that "[t]o the best of [his] knowledge and recollection" a copy of the additional insured certificate for L&K was sent to Hull pursuant to that practice.  *Carlson Aff.* ¶¶ 8 and 11.  While the statement is admissible to show that it was the Carlson Agency's standard practice to send a copy of endorsements to Hull, it is not admissible to show that the L&K endorsement was actually sent to Hull. The speculative assertion that "to the best of his knowledge" it was sent is not sufficient to create a genuine issue of material fact to rebut Nautilus' assertion that it never received the documents.

### 2.    Bruce Affidavit

Nautilus objects to Ms. Bruce's statements that Hull authorized Mr. Carlson "to issue routine additional insured certificates directly from our office without first obtaining specific approval from Hull & Company for each request."  *Bruce Aff.* ¶ 6.  Nautilus

further objects to her statement that a copy of the additional insured certificate issued by the Carlson Agency to L&K "would have been sent by Carlson Insurance Agency to Hull & Company on or about March 29, 2007." *Bruce Aff.* ¶ 9.

Ms. Bruce's statement with regard to authorization from Hull to Carlson to issue additional insured certificates without prior approval suffers from the same deficiencies as Mr. Carlson's statement and shall be stricken. Furthermore, Ms. Bruce's deposition testimony indicates that she only learned of Hull's alleged change in procedure from Mr. Carlson. Her statements, then, are clearly inadmissible hearsay. *See* Fed. R. Evid. 802. Finally, like Mr. Carlson's statement, her statement that the certificate *would* have been sent falls short of creating a genuine issue of material fact. She offers no evidentiary support tending to prove that it *was* sent.

## LEGAL STANDARDS

### A.    Summary Judgment

A court must grant summary judgment in favor of the moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). In support of a motion for summary judgment, the moving party must cite to materials in the record in support of its assertions, including but not limited to depositions, documents, and affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). It may also consider other materials in the record not cited by the moving party. Fed. R. Civ. P. 56(c)(3). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). The Court must "bear in mind the actual quantum and quality of proof necessary to support liability." *Liberty Lobby*, 477 U.S. at 254. In other words, it must be "guided by the substantive evidentiary standards that apply to the case." *Id*. at 255.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.*; *Liberty Lobby*, 477 U.S. at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir. 2002).

**B.     Choice of Law**

**1.     Washington Decisions**

In remanding Williams' case to the Washington Court of Appeals, the Washington Supreme Court noted that Washington adheres to the "most significant relationship" test set forth in Restatement (Second) of Conflict of Laws § 6 (1971) and remanded with instructions to the Court of Appeals to review the trial court's determination that Idaho law applied giving due consideration to Restatement (Second) of Conflict of Laws § 146 (1971), which references Section 6, and Washington case law. *Williams I*, 254 P.3d at 823. Section 6 addresses considerations such as (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

On remand, the Court of Appeals specifically relied on Restatement § 146, which addresses conflicts in personal injury cases, as directed by the Supreme Court. *See Williams II*, 285 P.3d at 909-10. The court noted that when the contacts are evenly balanced, it must proceed to an "evaluation of the interests and public policies of the involved states to determine which state has the greater interest in the determination of the particular issue." *Id*. at 910 (citations omitted). It then proceeded to consider the

policy considerations set forth in Section 6.  *Id*. at 910-11.

The Court of Appeals rejected L&K's arguments that the most significant relationship test dictated that Idaho law applied to issues of immunity, comparative negligence, damages cap, and other issues.  With regard specifically to the immunity issue, the court reasoned:

> Applying the interest analysis, it is clear that the immunity granted by Idaho protects the interests of third parties operating within the state of Idaho.  In contrast, by applying Washington law that does not grant immunity, Washington can protect the interests of its citizens seeking a full recovery, and Washington is able to regulate one of its corporations.  Hence, while Idaho seeks to apply a local law to this situation, Washington has a greater interest in obtaining a full recovery for one of its citizens by regulating a Washington corporation.

*Id*. at 912.

### 2.    Idaho Law on Conflict of Law Resolution

In general, like Washington, Idaho follows the "most significant relation test" as set forth in the Restatement (Second) of Conflict of Laws in determining the applicable law in a conflict situation in a *tort* case.  *Grover v. Isom*, 53 P.3d 821, 823-24 (Idaho 2002) (citing *Seubert Excavators, Inc. v. Anderson Logging Co*., 889 P.2d 82, 85 (Idaho 1995)).  With respect specifically to *insurance contract disputes*, it follows Section 193 which provides that they are governed by the law of the state which the parties understood was to be the principal location of the insured risk *unless* some other state has a more significant relationship under the principles stated in Section 6 mentioned above.

*See Barber v. State Farm Mut. Auto. Ins. Co.*, 931 P.2d 1195, 1199 (Idaho 1997) (citing

*Restatement (Second) of Conflict of Laws* § 193) (emphasis added).  In other words, the

presumption exists that the law of the location of the insured risk applies unless Section 6

policy considerations dictate a different result.  Factors listed in Section 188 may

supplement the Section 6 considerations in determining which state has the most

significant relationship to the dispute.  *Id.*

Section 188 directs courts to look to the following factors: (1) the place of

contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4)

the location of the subject matter of the contract; and (5) the domicile, residence,

nationality, place of incorporation and place of business of the parties.  *Id.* (citing § 188).

In short, under Idaho law, in an action involving an insurance contract dispute, the

law of the state where the insured risk is located is presumed to apply unless policy

considerations and other factors set forth in Sections 6 and 188 suggest another state bears

a more significant relationship to the dispute.

### 3.    Most Significant Relationship

Here, applying the most significant relationship test, the Court finds that Idaho law

applies with respect to the pending insurance policy coverage issues.  Pro-Set is an Idaho

corporation doing business in Idaho, the insured risk was work performed by Pro-Set at

job sites in Idaho, Pro-Set acquired the policy in Idaho through an Idaho insurance

producer and Nautilus' Idaho statutory agent, Hull & Company, the policy was issued in

Idaho, one of the additional insured endorsements was for an Idaho development

company, the policy reflects an Idaho address, and the accident occurred in Idaho. Although L&K is a Washington corporation, it is claiming coverage for an accident that occurred in Idaho on a project in which it was engaged in Idaho utilizing the services of an Idaho subcontractor. Although Williams is a Washington resident, he was working in Idaho for an Idaho company. Therefore, the most significant relationship is to Idaho.

Nautilus is not a party in the Washington case, and the Washington Court of Appeals was addressing a conflict issue in the context of a *tort* case involving two of its citizens as opposed to this Court which must address the conflict issue in the context of an insurance *contract* dispute. The conflict principles and policy considerations facing each court differ. The concerns for protecting a Washington resident from injuries incurred due to the negligence of a Washington corporation, while understandable, are distinctly different from the concerns for protecting the rights and duties of parties to an insurance policy whose most significant relationships are to Idaho.

### 4.   Full Faith and Credit

L&K agreed that Idaho law should apply and argued that position before the Washington Court of Appeals in the Williams' action. However, as discussed above, that court found that Washington law applied. Absent a reversal by the Washington Supreme Court, L&K notes that Washington law will "control[ ] the fate of L&K" leaving L&K "between a rock and a hard place." *L&K's Resp.* at 7. L&K now argues, without discussion or citation to authority, that this Court is bound by the Washington Court of Appeals decision under the principal of full faith and credit to the judgment of a sister

state.  *Id*.   The Court disagrees.

In relevant part, the Full Faith and Credit Clause of the Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. Art. IV, § 1.  "A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.  For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force."  *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 232 (1998).   "To determine the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state."  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  The Court need look no further than *Williams I* for the Washington Supreme Court's statement of preclusion law.

In *Williams I*, the Washington Supreme Court stated:

> Res judicata is a doctrine of claim preclusion.  It bars relitigation of a claim that has been determined by a final judgment.  Res judicata applies where the subsequent action involves (1) the same subject matter, (2) the same cause of action, (3) the same persons or parties, and (4) the same quality of persons for or against whom the decision is made as did a prior adjudication.

*Williams I*, 254 P.3d at 820-21 (citations omitted).

Here, although Williams' workplace injury is common to both the case before this Court and the case before the Washington court, the subject matter of both suits is not the

same.  The cause of action here is insurance contract interpretation whereas the

Washington action is a tort action, and the same parties are not involved in both actions.

Only L&K is involved in both actions, and Williams is not a party to this action.

>    *Williams I* also addressed the concept of collateral estoppel:

>> Collateral estoppel is a doctrine of issue preclusion.  It bars
>> relitigation of issues of ultimate fact that have been
>> determined by a final judgment.  Collateral estoppel requires
>> that (1) the identical issue was decided in the prior
>> adjudication, (2) the prior adjudication resulted in a final
>> judgment on the merits, (3) collateral estoppel is asserted
>> against the same party or a party in privity with the same
>> party to the prior adjudication, and (4) precluding relitigation
>> of the issue will not work an injustice.

*Williams I*, 254 P.3d at 821 (citations omitted).

>    The identical issue was not decided in the Washington action.  Rather, as stated

above, the Washington court was addressing the conflict of laws issue in the context of a

tort action as opposed to the interpretation of an insurance policy.  Furthermore, Nautilus,

the party against whom L&K in effect asserts collateral estoppel, was not a party to the

Washington case or in privity with Williams.

>    The Court finds, applying Washington preclusion law, that the holding in *Williams

II* would not be granted preclusive effect against the action pending in this Court that

involves different parties and different issues.  Accordingly, the Court is not required to

give full faith and credit to the finding on the conflict of laws issue of the Washington

Court of Appeals in *Williams II*.  The Court would reach the same result even if Idaho law

were to be applied.  *See Kootenai Elec. Co-op. v. Lamar Corp.*, 219 P.3d 440, 444 (Idaho

2009).

# ANALYSIS

As stated above, Nautilus advances several arguments in favor of summary judgment.  Primarily, it contends that the Carlson Agency was not its agent and therefore lacked authority to issue the certificate of liability and additional insured endorsement to L&K.  Additionally, it contends that even if it were bound by the actions of the Carlson Agency, Pro-Set and L&K are not entitled to defense or indemnity for the injuries Williams incurred during the course of his employment because the Policy excludes coverage for those claims.  The Court finds that Nautilus is entitled to summary judgment on each of these grounds.

## A.    Agency Issues

### 1.    Authority of the Carlson Agency

Nautilus contends that the Carlson Agency was not its agent because it lacked either actual or apparent authority to issue the additional insured endorsement and certificate of liability insurance to L&K.  Nautilus asserts it did not receive the documents until Williams filed suit in Washington.

As a starting point in determining whether there was an agency relationship between Nautilus and the Carlson Agency, the Court looks to Idaho insurance law.  Idaho Code § 41-1018 provides that "[a]n insurance producer shall not act as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer."  Idaho Code § 41-1018(1).  In order to appoint a producer as its agent, "the appointing insurer

[must] file, in a format approved by the director, a notice of appointment within fifteen (15) days from the date the agency contract is executed or the first insurance application is submitted."  Idaho Code §41-1018(2).  The insurance director then has thirty (30) days within which to verify that the insurance producer is eligible for appointment.  Idaho Code § 41-1018(3).

It is undisputed that Nautilus did not statutorily appoint the Carlson Agency as its agent.  Rather, Hull is its statutory agent in the state of Idaho.  Absent an express designation, the question becomes whether there was any other basis for finding authority for the Carlson Agency to issue the additional insured endorsement and certificate of liability to L&K.

As observed by Nautilus, agency may be created by express authority, implied authority, or apparent authority.  *See Bailey v. Ness*, 708 P. 2d 900, 902 (Idaho 1985).  "An agent may bind a principal if the agent has actual authority or apparent authority." *Vreeken v. Lockwood Engineering, B.V.*, 148 Idaho 89, 109, 218 P.3d 1150, 1170 (Idaho 2009).  Idaho follows the majority rule regarding the various forms of agency:

> Both express and implied authority are forms of actual authority.  Express authority refers to that authority which the principal has explicitly granted the agent to act in the principal's name.  Implied authority refers to that authority "which is necessary, usual, and proper to accomplish or perform" the express authority delegated to the agent by the principal.
>
> Apparent authority differs from actual authority. It is created when the *principal* "voluntarily places an agent in such a position that a person of ordinary prudence, conversant with

> the business usages and the nature of the particular business,
> is justified in believing that the agent is acting pursuant to
> existing authority."  Apparent authority cannot be created by
> the acts and statements of the agent alone.

*Bailey*, 708 P.2d at 902-03 (internal citations omitted) (emphasis in original).

The concept of apparent authority "can be applied to someone who appears to be the agent of another but actually is not."  *Nava v. Rivas-Del Toro*, 264 P.3d 960, 966 (Idaho 2011).  "The issue in apparent authority is not whether it reasonably appeared to the plaintiff that the tortfeasor was acting within the course or scope of his or her employment, but whether the plaintiff reasonably believed, *based upon the principal's conduct*, that the tortfeasor had authority to act on the principal's behalf."  *Id*. at 956-67 (emphasis added).  *See also Jones v. HealthSouth Treasure Valley Hospital*, 206 P.3d 473, 481 (Idaho 2009) ("We have only required that a person be 'justified in believing' the agent was acting pursuant to existing authority, rather than relying on the agent's services, in order to establish apparent authority.").

Here, there is no evidence to contradict Nautilus' assertions that Nautilus never authorized the Carlson Agency to issue additional insured endorsements and certificates of liability.  Indeed, the Carlson Agency admits there was no direct contact with Nautilus.  *See Bruce Aff.* ¶ 10 ("Carlson Insurance Agency would have no need or reason to communicate directly with Nautilus.")

Because Nautilus did not grant express authority to the Carlson Agency to issue additional insured endorsements and certificates of liability, there could have been no

implied authority given that implied authority is dependent on the existence of express authority.  Likewise, because there was no direct relationship or any alleged direct communication between the Carlson Agency and Nautilus, no apparent authority could have existed.  In other words, there was no action on the part of Nautilus that would permit the Carlson Agency to reasonably believe that it had authority to issue additional insured endorsements or certificates of liability or that Hull had the authority to allow the Carlson Agency to do so.  Accordingly, the additional insured endorsement and certificate of liability purportedly issued by the Carlson Agency to L&K was not binding on Nautilus.

### 2. Hull and Carlson

Pro-set and L&K have offered no evidence other than the challenged affidavits of Carlson Agency personnel substantiating their claim that Hull authorized the Carlson Agency to issue additional insured endorsements without going through the regular process described below of submitting the request to Hull first for its approval.  Noticeably absent are any affidavits or deposition testimony from Hull that would support Pro-Set's and L&K's position.  However, even assuming that Hull did authorize the Carlson Agency to issue additional insured endorsements, there is no admissible evidence that Hull was acting within its authority to bind Nautilus when it varied from Nautilus' guidelines.

### 3. Hull and Nautilus

Craig Williams, a regional vice president of Nautilus, testified in his deposition that Nautilus had an agency agreement with Hull that authorized Hull to bind Nautilus coverage.  *Williams Depo. Excerpt* at 16, Dkt. 43-4 at 6.  Guidelines or criteria for the

placement of insurance or additional insured endorsements were set forth in Nautilus'

electronic underwriting guide.  *Id*. at 17.  Mr. Williams described the policy and procedure

as follows:

> The insured would make the request showing the need for the
> additional insured to the retail agent.  The retail agent would
> then take that request and forward it to Hull & Company.  Hull
> & Company would then review the request, and if it fell within
> their authority, they could then issue the additional insured
> endorsement and send it back to the retailer who would then
> provide it to the insured.  If it did not meet their authority
> guidelines, they would just forward it on to Nautilus or an
> underwriter to utilize the acceptable pricing.

*Williams Depo. Excerpt* at 17.

The procedures under Nautilus' guidelines were followed in part.  Pro-Set made a

request to the Carlson Agency to have L&K listed as an additional insured.  At this point,

the request should have been sent to Hull to either approve if it met the necessary

underwriting guidelines or to forward to Nautilus for underwriter review if it did not.

Where the procedure breaks down in this case, is that there is no admissible

evidence that the Carlson Agency ever sent the request to Hull.  Under these facts, Carlson

was making the decision to add L&K as an additional insured on Pro-Set's policy rather

than Hull.  However, Nautilus' guidelines specified that Hull was to approve and issue any

endorsements – not the Carlson Agency.

There is no indication that the procedure allegedly authorized by Hull whereby the

Carlson Agency could unilaterally issue additional insured endorsements was "necessary,

usual, and proper to accomplish or perform" the express authority delegated to it by

Nautilus.  Therefore, there is no basis for a finding of implied authority.  Nor is there evidence that Nautilus, as principal, took any action with respect to Hull or the Carlson Agency that would lead either entity to reasonably believe that Hull had the apparent authority to delegate issuance of  additional insured endorsements or certificates of liability .  Therefore, because the Court finds that Hull had no actual or apparent authority to institute the arrangement with the Carlson Agency, the Carlson Agency could not reasonably rely on Hull's authorization, if any.

According to L&K, Nautilus "explicitly empowered Hull to oversee relations with retail producers like Carlson, to promote coverage on their behalf, to issue certificates of insurance and additional insured endorsements, and to bind it to coverage to individual insureds like Pro-Set and L&K." *L&K Brief* at 8.  "Nautilus . . . created the framework within which this coverage was placed." *Id.*  Be that as it may, however, Nautilus has shown that Hull did not have the authority to delegate to the Carlson Agency the authority to issue additional insured endorsements and certificates of liability, and L&K has not raised a genuine issue of material fact on this point.

Nautilus clearly delegated to Hull the authority to issue additional insured endorsements if Nautilus' guidelines were met.  As a matter of law, however, Hull did not have the authority to delegate that discretionary function to the Carlson Agency, although it would have had the authority to delegate the performance of "incidental mechanical and ministerial acts" in connection with its authority to issue additional insured endorsements. *See United States v. Mendoza-Acuna*, 764 F.2d 699, 702 (9th Cir. 1985) (quoting

*Restatement (Second) of Agency* § 78) (finding that agent could delegate authority to subagent to sign a document in agent's name once agent made the decision to post bond). Here, however, Hull did not make the decision to issue the endorsement to L&K and then authorize the Carlson Agency to sign on its behalf.  Rather, Hull purportedly allowed the Carlson Agency to make the decision to issue the endorsement to L&K, and Carlson "assumes" it forwarded the endorsement to Hull for forwarding to Nautilus.  However, there is no evidence that either Nautilus or Hull received the endorsement or that Nautilus was aware that Hull had an arrangement with the Carlson Agency to process the endorsements.

### B.    Policy Exclusions

Aside from the agency question, Nautilus contends that it is not required to defend or indemnify either Pro-Set or L&K both because Williams' injuries occurred in the course of his employment and because his injuries were covered by worker's compensation and therefore excluded under Pro-Set's commercial general liability policy.

A duty to defend arises only where an insurance policy provides that the insurer has a duty to defend against the specific type of claim alleged.  *Dave's, Inc. v Lindford*, 291 P.3d 427, 431 (Idaho 2012) (citing *Constr. Mgmt. Sys., Inc. v. Assurance Co of America*, 135 Idaho 680, 683, 23 P.3d 142, 145 (2001)).  Stated another way, "[f]or there to be a duty to defend, the complaint's allegations, in whole or in part, when read broadly, must allege a claim to which the duty to defend applies under the terms of the insurance policy." *Id*.  Where an insurance policy excludes certain types of claims from coverage, a duty to

defend those claims does not arise.  *Id*. at 432-33 (finding no duty to defend a contractor's

action against homeowner brought as a breach of contract claim under a "because of . . .

property damage" provision "to which this coverage applies" because the policy excluded

property damage to the home.)  *See also County of Boise v. Idaho Counties Risk*

*Management Program*, 265 P.3d 514, 517 (Idaho 2011) ("The insurer need only look at

the words of the complaint 'to determine if a possibility of coverage exists.'  If the

complaint discloses no possibility of coverage, the insurer may properly decline to defend

against it.") (citations omitted) (finding no duty to defend where lawsuit arose out of or

was connected with land use regulation or planning and zoning activities which were

specifically excluded under policy).

An insured's duty to defend and duty to indemnify are separate, unrelated, and

independent duties.  *Deluna v. State Farm Fire and Casualty Co.*, 233 P. 3d 12, 16 (Idaho

2008).  The duty to defend is broader than the duty to indemnify and "is triggered only

where an insurance company would be obligated to pay the underlying action regardless of

how it fulfilled its duty to defend."  *Id*.  If reading a complaint broadly reveals no potential

for liability in the duty to defend analysis, there is no duty to indemnify.  *Hoyle v. Utica*

*Mutual Insurance Company*, 48 P.3d 1256, 1264 (Idaho 2002).

### 1.    Williams' Was An Employee or Co-Employee of Pro-Set.

The Policy excludes coverage for injuries to an employee or a contractor occurring

in the scope of his employment.  More specifically, Exclusion E of the Policy excludes an

employer's liability for "bodily injury" to an "employee" "arising out of and in the course

of:  (a) Employment by any insured; or (b) Performing duties related to the conduct of any insured's business; . . ."  For Exclusion E purposes, the policy very broadly defines "employee" as "any person or persons who provide services directly or directly to any insured" and includes a "leased worker," "temporary worker," "volunteer worker," a contractor, a subcontractor, an independent contractor, and "any person or persons hired by, loaned to, or contracted by an insured's contractor, subcontractor, or independent contractor . . . ."

### (a)    *L&K Argument*

L&K states that Nautilus bases its entire argument on a "not legally correct" fact that Williams was an employee of Pro-Set when in fact he was actually an employee of Pay Check Corporation and not of Pro-Set.  However, the record demonstrates that Pro-Set and Pay Check Corporation were Williams' co-employers.

The deposition testimony offered by L&K in support of its argument clearly states that Pay Check and Pro-Set were co-employers of Williams.  *Bohrnsen Aff.*, Attachment 1, Dkt. 40-1.  Essentially, it appears that Williams worked for or performed services for Pro-Set but Pay Check provided payroll and human resource services as well as worker's compensation for Pro-Set.  *Id.*; *Nelson Aff. ¶ 7*; *Reply, Ex. A, Nelson Depo. Excerpt* at 24-28, Dkt. 44-2 at 6-7; *Reply, Ex. B. Jost Depo. Excerpt* at 6-7, Dkt. 44-3 at 5-7.  Even setting this aside, he would still fall under the broad definition of "employee" even if Pro-Set did not write the checks so to speak given that he at the very least provided services indirectly to both Pro-Set and L&K.

Nautilus cites to a recent district court case interpreting Exlcusion E in nearly identical circumstances.  *See Nautilus Insurance Co., v. K. Smith Builders, Ltd.*, 725 F.Supp. 2d 1219 (D. Haw. 2010).  In *K. Smith Builders*, the worker injured at a construction site was an employee of a company that leased him to a subcontractor of the defendant builder.  He received workers' compensation benefits from his immediate employer.  The parties disputed whether the worker was an "employee" whose bodily injuries were excluded from coverage under the Endorsement Exclusion.  The court found that the "plain and ordinary meaning of the Policy" precluded coverage for K. Smith Builders.'  *Id*. at 1125.  Noting the very broad definition of "employee" in the exclusion, the court found that the injured worker was a person "who provide[d] services directly or indirectly to any insured" because he was on the construction site as a worker loaned out to and performing work for a subcontractor of K. Smith Builders.  *Id*. at 1226.  In reaching this decision, it noted that "Defendants are fruitlessly splitting hairs" when arguing that the worker was not an employee of the contractor and further noted that the already broad definition of "employee" was further extended by the phrase "including but not limited to" which it termed was "an expression of enlargement, indicating that the examples that follow are simply an illustrative non-exhaustive list of examples subject to expansion."  *Id.* (citing *Bloate v. United States*, 130 S.Ct 1345, 1354 (2010)).

Even if Pay Check Corporation were the employer, the relationship between Pro-Set and Pay Check Corporation is sufficiently analogous to the "leased employee" relationship in *K. Smith Builders* and well within the expansive definition of "employee"

that the exclusion should apply.  L&K continues that Pay Check Corporation "hired him out to Pro-Set. . . . [t]his is a distinction with a difference."  *L&K Response* at 11.  However, in the Court's view, this is a distinction *without* a difference and that L&K is "fruitlessly splitting hairs" much like the contractor in *K. Smith Builders*. Whether Williams was employed by Pro-Set or Pay Check Corporation, he was performing services for both Pro-Set and L&K and thus falls within the Exclusion E definition of employee.

L&K, while acknowledging that *K. Smith Builders* on its face adopts Nautilus' arguments here, urges the Court to "evaluate the propriety of adopting this holding under the facts of the instant case for this district."  *L&K Response* at 11.  However, the facts of *K Smith Builders* are sufficiently similar to the facts of this case to warrant adopting its holding.  Although the Court is not bound by the decision in *K. Smith Builders*, the Court finds its reasoning persuasive.

The Court finds that under Exclusion E's definition of "employee," Williams was an employee of L&K, he was injured in the course of that employment, and even if L&K were covered under the additional insured endorsement, that there is no basis for recovery under the policy.  Therefore, Nautilus does not owe L&K a duty to defend or to indemnify. *See id.* at1231.  *See also Nautilus Insurance Co. v. Triple C Construction, Inc.*, 2011 WL 42889 (D.N.J. Jan. 6, 2011) (construing substantially similar exclusion); *Nautilus Insurance Company v. Barfield Realty Corp., et al.*, 2012 WL 4889280 (S.D. N.Y. Oct. 16, 2012) (noting that other courts have found Nautilus policy exclusions enforceable).

**(b)**   *Pro-Set's Argument*

Pro-Set advances a different argument.  It contends that the Exclusion Endorsement amends Section 1, paragraph 2(e) of the Policy itself by replacing the definition of "employee" and concludes with "All other terms and conditions of this policy remain unchanged."  *Pro-Set Response* at 3.   Pro-Set then notes that paragraph 2(e) on page 2 of 15 of the main policy contains the additional sentence, "This exclusion does not apply to liability assumed by the insured under an 'insured contract.'"  They question whether the additional sentence was deleted by the exclusion endorsement.  *Id*.  Contending that the subcontract agreement between Pro-Set and L&K meets the definition of "insured contract" and that Pro-Set agreed to assume responsibility for tort liability for claims resulting from or connected with the performance of the subcontracted work, Pro-Set concludes that the exclusion does not apply or that at the very least there is an ambiguity that should be resolved in its favor.  The Court disagrees.

As Nautilus notes, the revision "Exclusion – Injury to Employees, Contractors Volunteers and Workers" (the "Amendment") that amends Section 1, paragraph 2(e) of Exclusion e under the policy clearly stated that the following language "replaces" Exclusion e in the main policy.  A comparison of the language in the main policy with the language in the amendment reveals that it is identical except for the phrase "This exclusion does not apply to liability assumed under an 'insured contract'" that had appeared in the main policy.  Obviously, if Nautilus had not intended to remove that language from Exclusion E, the amendment would have been pointless.  Accordingly, the Court finds that

the amendment is not open to conflicting interpretations and is therefore not ambiguous.

### 2.     Williams' Entitlement to Worker's Compensation Benefits Excludes Coverage

Nautilus next argues that it does not have a duty to defend or indemnify because under Exclusion D, the Policy excludes coverage for any injury that would be covered by workers' compensation insurance even if the employee does not make a claim for benefits. The exclusion provides that "[t]his insurance does not apply to . . . [a]ny obligation of the insured under a worker's compensation, disability benefits or unemployment compensation law or any similar law."

It is undisputed that Williams here received worker's compensation benefits through the worker's compensation policy carried by Pay Check Corporation for Pro-Set's employees.  Accordingly, any claim by Williams under the Policy would be excluded. Indeed, one could argue that if the broader Exclusion E applies, it is unnecessary to even reach the applicability of Exclusion D.

The Idaho Worker's Compensation Act provides employees with an exclusive remedy for injuries arising out of and in the course of employment thereby "remov[ing] all workplace injuries from 'private controversy'" by providing relief to injured employees regardless of fault.  *Blake v. Starr*, 203 P.3d 1246, 1248 (Idaho 2009) (citations omitted). The definition of "employer" under the Idaho Worker's Compensation Act encompasses more than the common law definition of "employer."  *Id*.  It includes not only the person who has expressly hired another but also the person who is statutorily held to be the

employer under the Worker's Compensation Act.  *Id.* (citations omitted).  A statutory employer is "anyone who, by contracting or subcontracting out services, is liable to pay worker's compensation benefits if the direct employer does not pay those benefits."  *Id*. at 1249 (citing *Robison v. Bateman-Hall, Inc.*, 76 P.3d 951, 954-55 (Idaho 2003)).  *See also Venters v. Sorrento Delaware, Inc*., 108 P.3d 392, 396 (Idaho 2005).  In other words, "employers who make use of a contractor's or subcontractor's employees" are statutory employers and are immune from liability.  *Id.*

Under Idaho law, any claim made by Williams against either L&K or Pro-Set would be barred because they both would be immune from suit given that they would be considered "statutory employers" for purposes of the Idaho Worker's Compensation Law. *See* Idaho Code § 72-201, *et seq*.  Accordingly, no cause of action lies under the policy against L&K or Pro-Set.

Nautilus has cited treatises and cases indicating that the policy behind the employee exclusions is to prevent turning a commercial general liability policy into a worker's compensation or employer's liability policy.  Along the same lines, the Court finds particularly pertinent language quoted in a very recent case in the Southern District of Florida involving employee and workers' compensation exclusions in a substantially similar fact situation:

> Statutory employees have been treated identically to actual employees in relation to standard employee exclusion clauses . . . .  The logic in the exclusion from coverage of both types of employees is simple and compelling: the only coverage intended, and for which the premium has been paid, is the

> liability of the insured to the *public*, as distinguished from
> liability to the insured's employees whether or not they are
> protected by the workers' compensation law.

*Amerisure Ins. Co. v. Orange & Blue Const., Inc.*, 2012 WL 6652936 at *10 (S.D. Fla. Dec. 21, 2012) (quoting *Florida Insurance Guaranty Association, Inc. v. Revoredo*, 698 So. 2d 890, 892 (Fla. App. 3 Dist. 1997) (emphasis added). Neither Defendants nor the Court has located any cases finding the workers' compensation exclusion ambiguous or unenforceable.

L&K's argument against the applicability of Exclusion D, in which Pro-Set joins, is that Nautilus should not be entitled to benefit from Idaho Worker's Compensation laws since the Washington Court of Appeals has ruled that Idaho law does not apply to Williams' suit and L&K will not be granted immunity in that suit. *L&K Resp.* at 13. L&K believes that Nautilus' argument must fail because it rests on the false assumption that this is a workers' compensation case and the legal conclusion that L&K enjoys statutory immunity under Idaho law. *Id.* at 15.

L&K has not presented any authority in support of its position. The Policy is a general liability policy meant for protection against claims of the public and not for claims of employees. Therefore, it is not dependent on the provisions of the various states' workers' compensation laws. Furthermore, even if arguably L&K should prevail on this exclusion, coverage would still be excluded under Exclusion E which is not dependent on workers' compensation coverage.

## CONCLUSION

The Court recognizes that L&K is in a difficult position given the Washington Court of Appeals' ruling that Williams is not precluded from pursuing his tort action against L&K.  However, as L&K itself argued before the Washington court, Idaho law should apply to the interpretation of the policy provisions.  Idaho law clearly applies using the most significant relation test.  Its policy considerations differ from that of the Washington courts faced with a Washington resident alleging negligence and resulting injury against a Washington corporation.

The Court finds that the Carlson Agency had no authority to bind Nautilus when it issued the certificate of liability and additional insured endorsement to L&K.  However, even if it did have the authority to do so, the Court finds that Nautilus has no duty to defend or to indemnify either L&K or Pro-Set under the Policy because coverage was clearly and unambiguously excluded under Exclusions D and E.  Accordingly, the Court grants Nautilus' Motion for Summary Judgment.

## ORDER

**IT IS ORDERED:**

1.    Plaintiff's Motion to Strike (Dkt. 43) is **GRANTED IN PART** as provided above.

2.    Plaintiff's Motion for Summary Judgment (Dkt. 20) is **GRANTED**. Accordingly, pursuant to the terms and conditions of the policy at issue, Nautilus Insurance Company does not have a duty to defend

Leone & Keeble, Inc. in the above-described Washington state court lawsuit, and Nautilus Insurance Company does not have a duty to indemnify Leone & Keeble and/or Pro-Set Erectors or to pay any judgment found in said action against Leone & Keeble, Inc. by Delbert Williams.

DATED: March 1, 2013

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 34**